In re CONDOR SYSTEMS, INC.; CEI Systems, Inc., Debtors.

Robert E. Young, II; John L. Taft, Appellants,

v.

Condor Systems, Inc.; Official Committee of Unsecured Creditors, Appellees.

BAP No. NC–02–1380–KMaRy. Bankruptcy Nos. 01–55472– JRG, 01–55473–JRG.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Oct. 23, 2002.

Filed July 18, 2003.

Patrick M. Costello, Bialson, Bergen & Schwab, Palo Alto, CA, for John L. Taft and Robert E. Young, II.

Sara L. Chenetz, Robinson, Diamant and Wolkowitz, Los Angeles, CA, for Official Committee of Unsecured Creditors.

David Richardson, Murphy, Sheneman, Julian and Rogers, Los Angeles, CA, for Condor Systems, Inc.

Before KLEIN, MARLAR, and RYAN, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

This is an appeal from an order rejecting former employees' termination dam-

ages claims. The bankruptcy court reasoned that draws on irrevocable letters of credit and prepetition severance payments reduced the 11 U.S.C. § 502(b)(7) cap on allowable claims of terminated employees. We hold that the § 502(b)(7) cap is calculated mechanically as of the date of the filing of the petition and that prepetition severance payments and pre- and postpetition draws on letters of credit may affect the amount of the claim but not the § 502(b)(7) cap. We REVERSE and REMAND.

## FACTS

Condor Systems, Inc. ("Condor") had "golden parachute" employee severance debts when it filed a chapter 11 case on November 8, 2001.

Appellant Robert Young, former chief executive officer and board chairman, was terminated twenty-one months prepetition. His "Employment Agreement" called for a $350,000/yr base salary, plus benefits, with a severance package of $1.4 million (plus ongoing medical, dental, and life insurance benefits for up to two years) to be paid in eight quarterly $175,000 installments.[1] In connection with termination, Young agreed to a "Consulting Agreement" that extended his medical and dental benefits on a premium reimbursement basis for ten years. Condor also remained obligated to keep paying premiums on two life insurance policies under a 1994 so-called "Split Dollar Agreement."

---

1. The severance term in Young's Employment Agreement was:

 ... $1,400,000. Such severance pay shall be paid in a lump sum to an escrow account at a bank designated by the Company, and thereafter shall be paid to the Employee in eight equal installments on the last business day of each of the eight fiscal quarters following [termination].

Young Proof of Claim, p. 14 (Employment Agreement, p. 7).

The record does not indicate why the parties agreed to substitute a letter of credit for an escrow account and why payments were made at the beginning, not the end, of quarters.

The $1.4 million portion of Young's Employment Agreement severance package was funded by "irrevocable standby letter of credit" No. 3023558 issued by Bank of America.[2]

As of the date of bankruptcy, Young had drawn $1,050,000 on the letter of credit and had two $175,000 installments ($350,000) remaining. He ultimately drew the full $350,000 on the letter of credit postpetition.

Young's $2,261,500 proof of claim, filed January 15, 2002, included the $175,000 remaining on the letter of credit as of that date ($175,000 had been drawn earlier that month). The other $2,086,500 reflected medical and dental ($30,000) and life insurance premiums and benefits ($56,500, plus $2,000,000 contingent liability for lapse of policy).

After the debtor objected, Young tried to withdraw the $175,000 severance portion of his claim on the premise that the initial issuance of the $1.4 million letter of credit had constituted full payment of that portion of his golden parachute and amended the balance of his claim to a general unsecured claim totaling $76,473.73 ($56,500 life insurance premiums and $19,973 in medical and dental expenses), plus an unliquidated amount for ten years of medical and dental coverage under the Consulting Agreement, together with the right to have a life insurance policy with a surrender value of about $165,000 released from a collateral assignment in favor of Condor.[3]

Appellant John Taft, former chief financial officer, was similarly situated. He was terminated eleven months prepetition and had a lower salary ($195,000/yr) and smaller severance package ($500,000), funded by Bank of America's "irrevocable standby letter of credit" No. 3032802 to be paid in eight quarterly $62,500 draws. As of bankruptcy, he had drawn $187,500, leaving five draws ($312,500) outstanding.[4]

Taft's $258,400 proof of claim, filed January 18, 2002, included the remaining $250,000 on the letter of credit as of that date ($62,500 had been drawn on January 7, 2002[5]) as a secured claim and $8,400 for

---

**2.** Young's February 28, 2000, letter of credit provided:

> We hereby establish in your favor our irrevocable standby letter of credit No. 3023558 which is available with Bank of America, N.A. by payment against presentation of the original of this letter of credit and your drafts at sight drawn on Bank of America, N.A., accompanied by the following document(s):
>
> Beneficiary's signed statement stating that in accordance with the employment agreement payment in the amount of $175,000 is due for the period ending [March, June, September, or December], [year].
>
> This letter of credit is available for drawings in accordance with the following schedule: [omitted in this footnote-last payment due April 10, 2002]
>
> We hereby agree with the beneficiary that documents presented to our office in compliance with the terms and conditions of this letter of credit will be duly honored as specified herein.
>
> This letter of credit is subject to the International Standby Practices 1998, ICC Publication No. 590.

Young Letter of Credit, Decl. of Frederic Bassett, Ex. C, p. 50 ("Bassett Decl.").

**3.** Resp. of Robt. E. Young II to Debtor's Objection to Claim and Amendment of Claim, 5/1/02, pp. 4–6.

**4.** Taft's November 29, 2000, letter of credit was identical to Young's, other than payments and dates. *Compare* Young Letter of Credit, Bassett Decl., Ex. C, p. 50, *with* Taft Letter of Credit, *id.*, p. 52. Taft's report of dates of payment in his transmittal reveals that draws were made at the start of each quarter. Taft Proof of Claim, p. 19 (transmittal letter).

**5.** Taft Proof of Claim, p. 19 (transmittal letter).

"continuation of employee benefits estimated at $8,400" as an unsecured priority wage claim. Taft explained in his transmittal letter that, as he would continue his letter of credit draws, he was "filing this proof of claim for protective purposes only and would make a claim against the estate for the severance payments only to the extent that payment is not made under the letter of credit and [he does] not continue to participate in all health, medical and dental plans." [6]

When the debtor objected, Taft mimicked Young and attempted to withdraw the $250,000 severance portion of his claim as having been fully paid by the issuance of his letter of credit. He asserted this withdrawal mooted the § 502(b)(7) issue and added, with respect to the $8,400 balance of his claim, "in light of the dollar amounts at issue and the additional expenses of further litigation, that he will not further litigate this aspect of the Debtors' Objection." [7]

The court did not authorize withdrawal of the claims and sustained the debtor's objections to the Young and Taft claims, ruling that prepetition severance payments and draws received under the letters of credit reduced the § 502(b)(7) one-year total compensation caps for Young and Taft to zero. `It rejected argument that the payments reduced the total claims but did not affect the § 502(b)(7) cap. And it made comments that cast a shadow over the propriety of further letter of credit draws.[8]

## JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158(a)(1).

## STANDARD OF REVIEW

■ Statutory construction issues are reviewed *de novo*. *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 551 (9th Cir. BAP 2001).

## ISSUES

1. Whether prepetition severance payments reduce § 502(b)(7)'s one-year cap for claims by terminated employees.

2. Whether a stream of pre- and postpetition severance payments under a letter of credit reduces the § 502(b)(7) one-year cap for claims by terminated employees.

## DISCUSSION

Before we address the questions regarding the meaning of the statute and the effects of prepetition termination payments and of postpetition payments under letters of credit, we must clarify a procedural issue that affects the analysis.

### I

■ The procedural problem relates to what was properly before the bankruptcy court for decision when it ruled on Taft's claim.

Before the hearing on the objection to Taft's claim, Taft attempted to withdraw his claim in an effort to eliminate the issue over the severance payment covered by his letter of credit on the theory that the

---

6. *Id.*

7. Resp. of John L. Taft to Debtors' Objection to Claim and Amendment of Claim, 5/1/02, p. 3.

8. "THE COURT: So if one of them attempts to draw down that letter of credit, I'd tell them to be very, very careful and give it some thought before he does that. ... We'll litigate that. ... I wouldn't bet a whole lot on your chances." Tr. of Hr'g, 6/26/02, p. 13.

issuance of the letter of credit was full payment. In his view, that mooted the § 502(b)(7) objection and left only the $8,400 benefits claim that he elected "not to further litigate" in view of the expense involved.

The court nevertheless sustained the objection, ruling that the § 502(b)(7) cap had been reduced to zero by virtue of the previous prepetition and postpetition payments on the letters of credit. It did not consider the merits of the balance of the benefits component of the claim.

An amendment of a claim (or component of a claim) to zero for the express purpose of mooting an objection to claim, is tantamount to withdrawing the claim. Although this invites a query whether the court subsequently decided a moot question, the operation of Federal Rule of Bankruptcy Procedure 3006 prevents the mooting of the dispute.

The filing of an objection to the claim terminates a creditor's power to withdraw a claim "as of right." FED. R. BANKR. P. 3006.[9]

It was settled in early practice under the Bankruptcy Act of 1898 that, once an objection has been filed, a claim may be withdrawn only with the permission of the court. In effect, this is an application of the considerations underlying Federal Rule of Civil Procedure 41(a), which formerly was regarded as the governing rule. *Id.*, advisory committee note.

Since the bankruptcy court proceeded to rule on the objection without having authorized withdrawal, Rule 3006 compels the conclusion that the court's ruling applied to Taft's original claim.

Thus, the appeal is not moot, and we turn to the § 502(b)(7) cap.

## II

The first step in understanding the § 502(b)(7) cap on employee termination damages is to focus on its precise language and on the distinction between cap and claim.

## A

The "allowable" claim of a terminated employee is capped by way of § 502(b)(7):

the court ... shall determine the amount of such claim ... *as of the date of the filing of the petition,* and shall allow such claim in such amount, except to the extent ...

(6) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the *compensation* provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or

9. Rule 3006 provides:

A creditor may withdraw a claim as of right by filing a notice of withdrawal, except as provided in this rule. If after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case, the creditor may not withdraw the claim except on order of the court after a hearing on notice to the trustee or debtor in possession, and any creditors' committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code. The order of the court shall contain such terms and conditions as the court deems proper. Unless the court orders otherwise, an authorized withdrawal of a claim shall constitute withdrawal of any related acceptance or rejection of a plan. Fed. R. Bankr.P. 3006.

such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7) (emphasis supplied).

■ The § 502(b)(7) test is a mechanical test that measures the allowable portion of terminated employee claims by referring to one year's compensation from the earlier of the date of termination or of the filing of the bankruptcy case, plus any accrued, but unpaid, compensation owing on such date. The measuring date merely serves to fix the cap on claims that will be allowed and does not have greater substantive consequences.

### B

■ There is a distinction in this construct between claim and cap. The *claim* is for the total available under substantive nonbankruptcy law. In contrast, the *cap* merely defines how much of the substantive claim will be "allowed" to be paid by the bankruptcy estate and mandates "disallowance" of the excess. Taken together, the claim and the cap yield the "allowed" or "allowable" claim.

■ In other words, as with the § 502(b)(6) lease rejection cap, the § 502(b)(7) cap merely establishes a limit on what will be allowed to be paid from the bankruptcy estate and is neither a substantive damages remedy nor a limit on substantive damages. *In re Iron–Oak Supply Corp.*, 169 B.R. 414, 419 (Bankr. E.D.Cal.1994) (§ 502(b)(6)). The cap, of course, becomes irrelevant if actual damages are less than the cap. *Id.*

We agree with the appellants that determining the total amounts of claims for damages resulting from termination of employment contracts, due as of the date of the filing of the petition, is independent of determining the § 502(b)(7) cap. The court, in addition to determining the amount that is "allowed" by the § 502(b)(7) cap, needs to determine the total amount of the claim in order to ascertain whether the total claim exceeds the cap.

In this instance, the court determined that the cap was zero and hence did not address the amount of the claim.

### 1

The § 502(b)(7) cap has two components. First, it includes the contractual "compensation" due for one year following the earlier of termination or the filing of the petition. 11 U.S.C. § 502(b)(7)(A). To this, there is added any unpaid compensation owed on such date. 11 U.S.C. § 502(b)(7)(B). The first category is in the nature of future damages, while the second represents back pay.

■ That the term "compensation" in § 502(b)(7) is more comprehensive than mere wages, salaries, or commissions and extends to include benefits is apparent from the narrower and more precise terminology that Congress used when providing priority status for certain employee claims. *Compare* 11 U.S.C. § 502(b)(7) ("compensation"), *with id.* §§ 507(a)(3)-(4) ("wages, salaries, or commissions, including vacation, severance, and sick leave pay" and "contributions to an employee benefit plan").

■ The breadth of the concept of § 502(b)(7) "compensation" normally necessitates factual determinations by the court regarding the amount of one year of compensation.

The starting place for the Young and Taft caps is their base salaries of $350,000/yr and $195,000/yr. Whether there were accrued but unpaid benefits due on the date of bankruptcy, which constitute

back pay that would correlatively increase the caps, is uncertain. Finally, one must determine the value of one year of their benefits.

### 2

The claim, in contrast to the cap, is limited only by what is available as damages under nonbankruptcy law.

Since the term "damages" in § 502(b)(7)(A) spans the full range of damages known to nonbankruptcy law that "result" from "termination of an employment contract," determination of the total amounts of the respective Young and Taft damage claims is fact-intensive. 11 U.S.C. § 502(b)(7)(A).

The evidentiary task in determining the amount of the claims is simplified by the Young and Taft contractual termination clauses. The provision for sums certain—$1.4 million and $500,000—left only the tasks of valuing the additional benefits and deducting amounts already paid.

The effect of prepetition termination payments on the total substantive claim, as opposed to cap, is straightforwardly that prepetition severance payments must be credited against substantive damages and hence against the claim. The cap is not adjusted because the payments come after the measuring date. In some instances, however, it may be that the application of prepetition payments to the claim may cause the estate's total liability under substantive nonbankruptcy law to be reduced to a sum as of the date of bankruptcy that is beneath the cap.

By the time the Condor bankruptcy was filed, prepetition payments had operated to reduce Young's damages to $350,000, and Taft's damages to $312,500, plus the value of all remaining benefits. For Taft the remaining benefits to be valued were thirteen months. For Young, who otherwise had only three months of benefits remain-

ing, the task is complicated by the open question whether the ten years of benefits provided by the Consulting Agreement should be included, as claimed by Young.

### C

The allowable amount of the claim under § 502(b)(7) is any amount up to the cap. Thus, in principle, Young's claim could be allowable up to $350,000, plus the value of one year of benefits (the additional § 502(b)(7)(B) unpaid compensation component apparently being zero). Likewise, Taft's claim could be allowable up to $175,000, plus the value of one year of benefits.

### III

The question whether the § 502(b)(7) cap is subject to adjustment to reflect payments subdivides into how one should treat prepetition severance payments and treat third-party payments.

### A

■ We have previously held that the § 502(b)(7) cap applies to damages resulting from termination of an employment contract, regardless of when the termination occurs. *Bitters v. Networks Elec. Corp. (In re Networks Elec. Corp.)*, 195 B.R. 92, 100 (9th Cir. BAP 1996) (termination 9–years prebankruptcy). We have not, however, decided whether payments made to a former employee after termination but before bankruptcy affect the § 502(b)(7) cap.

The bankruptcy court in this instance concluded that prepetition payments do matter. It ruled that the prepetition termination payments count against the § 502(b)(7) cap, which has the practical consequence of reducing the cap. Since prepetition payments to Young—who received 75 percent of his $1.4 million "golden parachute" prepetition—substantially

exceeded his $350,000 salary, it held that Young's cap as of the date of filing was zero.

The court analogized the § 502(b)(7) employment termination cap to the § 502(b)(6) lease rejection cap because similar language in the two subsections suggests that the lease cap served as the drafting model for the employment cap.[10]

The court then relied on § 502(b)(6) decisions, which hold that a prepetition security deposit in the hands of a lessor on a rejected lease must be applied to reduce the capped claim, with any excess turned over to the estate.[11] *In re Handy Andy Home Improvement Ctrs., Inc.*, 222 B.R. 571, 574–75 (Bankr.N.D.Ill.1998) (cataloging cases). In doing so, it used the analogy—which compares apples and oranges—as a means to equate letters of credit with security deposits.

In *Bitters*, we declined to analogize §§ 502(b)(6) and (b)(7) in derogation of § 502(b)(7)'s plain language, concluding that the cap applies regardless of when an employee is terminated. *Bitters*, 195 B.R. at 100 ("employee-creditor of § 502(b)(7) cannot readily be analogized to the land-

lord of § 502(b)(6)"), *citing In re Aero-Auto Co., Inc.*, 33 B.R. 107, 108 (Bankr. E.D.Va.1983).

In the wake of *Bitters*, we adhere to the plain language of § 502(b)(7)(A). The preambular portion of § 502(b)—"shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing* of the petition"—admits of one reading. 11 U.S.C. § 502(b) (emphasis added).

█ The date of filing bankruptcy is the measuring date for determining substantive damages, while the earlier of the date of termination or date of filing is the measuring date for determining the § 502(b)(7) cap. The use of the earlier of the date of bankruptcy or of termination as the measuring date for cap determination, but not damages, compels the conclusion that prepetition payments are irrelevant.

The fact that the back pay provision at § 502(b)(7)(B) raises the cap by the amount of "unpaid compensation due under such contract, without acceleration, on the earlier of such dates" supports our

---

**10.** 11 U.S.C. § 502(b)(6) tracks the language of § 502(b)(7):

> the court [shall allow claim], except to the extent that—
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

**11.** The legislative history of what is now § 502(b)(6), which is consulted because the statute is silent (hence ambiguous) about lessors' security deposits, explains:

> This paragraph will not overrule *Oldden [v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir.1944) ], or the proposition for which it has been read to stand: to the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate.

H.R. Rep. No. 95–595, at 353–54 (1977), U.S.Code Cong. & Admin.News 1978, at 5963, 6309; *accord,* S. Rep. No. 95–989, at 63 (1978), U.S.Code Cong. & Admin.News 1978, at 5787, 5849 (identical language).

conclusion. Consistent with canons of construction that require terms such as "unpaid" and "due" to be interpreted so as to give effect to each, the term "unpaid" makes the most sense as a separate concept if it means back pay due that remains unpaid at the time of the filing of the petition.

While we share the trial court's sentiment that a mechanical construction of the § 502(b)(7) cap winds up being generous to Young, who received more than $1 million in prebankruptcy "golden parachute" payments, such sentiments are irrelevant to a mechanical test. As we explained in *Bitters*, § 502(b)(7) reflects a compromise among competing interests of terminated employees and of the other constituents of the estate. *Bitters*, 195 B.R. at 100. The compromise is that the bankruptcy estate will pay to each terminated employee actual damages not to exceed one year of compensation as an unsecured, nonpriority claim. If Congress meant for the damages cap of § 502(b)(7)(A) to be reduced by prepetition payments, it could have included the term "unpaid" that it used in § 502(b)(7)(B). *Compare*, § 502(b)(7)(A) ("the compensation provided"), *with* § 502(b)(7)(B) ("any unpaid compensation due").

 Thus, the fact that Young received three years of base salary in the interval between termination and bankruptcy does not disqualify him from an allowable § 502(b)(7) claim for actual damages remaining "as of" the date of filing.

### B

 Nor do the irrevocable letters of credit in favor of Young and Taft necessitate a reduction of the § 502(b)(7) cap.

The committee's counsel argued that the Young and Taft claims should be disallowed "because the LC's draw clause becomes a liability of the debtor's estate." [12] We do not, however, agree that the rights of the issuer of a letter of credit were an appropriate basis to reject the claims.

### 1

In the context of claims, a letter of credit in favor of a creditor is properly analyzed as one species within the family of co-obligations that includes guarantees, sureties, and co-makers.

A letter of credit functions as a powerful form of guarantee in which a third party issuer undertakes to substitute its own creditworthiness for that of the debtor by promising to pay the debt as its own liability and with none of the defenses that are available to other guarantors and sureties. It is a form of creditor insurance against bankruptcy in which the letter of credit issuer assumes, among other risks, the risk that the entity for whom it issues the letter of credit may become insolvent.

We see no reason why the basic bankruptcy analysis of these various devices should be significantly different.

### 2

Nothing in § 502(b)(7) suggests that the cap should be reduced to the extent payment is obtained from a co-obligor. Indeed, the Bankruptcy Code measures a co-obligor's rights against the estate in terms of the rights of the underlying creditor. If the underlying creditor's claim against the estate is capped, so is the co-obligor's. Thus, one of the co-obligor's risks from the outset is the risk of less-than-full recovery.

Co-obligors remain liable and unable to hide behind the bankruptcy because the discharge "does not affect the liability of any other entity on" a discharged debt. 11 U.S.C. § 524(e).

---

**12.** Tr. of Hr'g, 6/26/02, p. 11.

The Bankruptcy Code affords co-obligors the alternatives of protecting themselves either by way of a claim for reimbursement or contribution or by way of subrogation. Co-obligors can, and commonly do, take security to support their claims.

We do not, however, understand any of these alternatives to operate as devices to circumvent the effect of the § 502(b)(7) cap with respect to the estate. The § 502(b)(7) cap stands for the proposition that property of the estate will not be liable for more than one year of a terminated employee's compensation.

■ A focus on the precise language of § 502(b)(7) reveals that it draws no distinctions among categories of claim. The operative word in the section is "claim" without any mention of "unsecured claim" or "secured claim." From the use of the general term "claim," it follows that the cap applies as much to secured claims as to unsecured claims.

■ A secured creditor is not entitled to look to its security for more than the allowable amount of its claim and will be vulnerable to turn over to the estate the value of its security to the extent that it exceeds the allowable amount of its claim. This is merely a facet of the proposition that the Bankruptcy Code functions to set boundaries on legal rights. *Solow v. PPI Enter. (U.S.), Inc. (In re PPI Enter. (U.S.), Inc.)*, 324 F.3d 197, 204 (3d Cir. 2003).

A co-obligor may file a claim on its own behalf for reimbursement or contribution, which will be allowed to the extent the creditor's claim is allowed but be in a disallowed status so long as it is contingent. 11 U.S.C. § 502(e).

In the alternative, a co-obligor who pays a claim against the debtor is automatically subrogated to the rights of the creditor to the extent of the claim and may proceed on that basis. 11 U.S.C. § 509(a). If a co-obligor does assert subrogation rights, then its claim for reimbursement or contribution will be disallowed. 11 U.S.C. § 502(e)(1)(C).

■ Finally, the co-obligor's claim by way of subrogation or for reimbursement or contribution is statutorily subordinated to the creditor's claim "until such creditor's claim is paid in full, either through payments under this title or otherwise." 11 U.S.C. § 509(c). This provision, in effect, assigns a priority to the underlying creditor over the co-obligor.

Thus, under either alternative, the co-obligor who pays a terminated employee's claim for damages is entitled to a claim against the estate, but only to the extent that the underlying creditor's claim is allowed and is subordinated to the creditor's claim until the creditor has been paid in full from any source.

Applied in the context of the § 502(b)(7) cap, the former employee's claim is disallowed to the extent it exceeds one year of compensation. Hence, the co-obligor's rights are similarly limited and are subordinated to the former employee's claim until it is paid in full.

### 3

While letters of credit are specialized financial instruments governed by Article 5 of the Uniform Commercial Code, there is nothing about the basic structure of the letter of credit transaction that calls for treatment different than other co-obligors in bankruptcy.

■ The essence of a letter of credit is an engagement by the letter of credit "issuer"[13] (obligor), acting at the instance

---

**13.** UCC Article 5 defines "issuer" as:

"Issuer" means a bank or other person that

of an "applicant" [14] (account party or customer), to pay money to the "beneficiary" [15] (obligee) according to the terms of the letter of credit and "independent" [16] of terms or performance on underlying contracts between applicant and beneficiary and between applicant and issuer. It is irrevocable unless otherwise provided.[17]

The letter of credit typically reflects the existence of three related contracts or engagements. First, the letter of credit is the issuer's engagement to honor draws by the beneficiary according to the terms on the face of the letter of credit. The "independence principle" makes this engagement independent of the other two contracts. Second, there is a contract between the applicant and the issuer providing for reimbursement of the issuer for draws on the letter of credit. Finally, there is the underlying contract between applicant and beneficiary as to which the beneficiary is unwilling to assume the credit risk of payment by the applicant. *P.A. Bergner & Co. v. Bank One (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1114–15 (7th Cir.1998); JOHN F. DOLAN, THE LAW OF LETTERS OF CREDIT ¶ 3.03[1], at 3–7 to 3–10 (rev. ed.1999); 6B WM. D. HAWKLAND, HAWKLAND UCC SERIES REV. § 5–109:10 (2002); David G. Carlson & Wm. H. Widen, *Letters of Credit, Voidable Preferences, and the "Independence" Principle*, 54 BUS. LAW. 1661 n. 1 (1999).

 As with other forms of guarantee, payment by the issuer gives rise to a right of reimbursement and subrogates the issuer to the rights of the beneficiary.[18]

---

issues a letter of credit, but does not include an individual who makes an engagement for personal, family, or household purposes.
CAL. COM. CODE § 5102(a)(9).

14. UCC Article 5 defines "applicant" as:
"Applicant" means a person at whose request or for whose account a letter of credit is issued. The term includes a person who requests an issuer to issue a letter of credit on behalf of another if the person making the request undertakes an obligation to reimburse the issuer.
CAL. COM. CODE § 5102(a)(2).

15. UCC Article 5 defines "beneficiary" as:
"Beneficiary" means a person who under the terms of a letter of credit is entitled to have a complying presentation honored. The term includes a person to whom drawing rights have been transferred under a transferable letter of credit.
CAL. COM. CODE § 5102(a)(3).

16. The "independence principle" is codified:
(d) Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.

CAL. COM. CODE § 5103(d).

17. The controlling provision is:
(a) [date provision omitted.] A letter of credit is revocable only if it so provides.
(b) After a letter of credit is issued, rights and obligations of a beneficiary, applicant, confirmer, and issuer are not affected by an amendment or cancellation to which that person has not consented except to the extent the letter of credit provides that it is revocable or that the issuer may amend or cancel the letter of credit without that consent.
CAL. COM. CODE § 5016(a)-(b).

18. The pertinent UCC provisions are:
(i) An issuer that has honored a presentation as permitted or required by this subdivision: (1) is entitled to be reimbursed by the applicant in immediately available funds not later than the date of its payment of funds;
CAL. COMM. CODE § 5108(i)(1).
(a) An issuer that honors a beneficiary's presentation is subrogated to the rights of the beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.

18

Thus, although Bank of America issued the letters of credit to Young and Taft on the application of Condor, the obligation to pay is direct and primary as between Bank of America and Young and Taft and is exclusively defined by the terms of the letters of credit "independent" of performance, or lack thereof, by anyone else, including Condor, Young, and Taft.

In sum, settled letter of credit law requires Bank of America to pay Young and Taft, even if Condor is broke.

4

In light of the bankruptcy limitations on the rights of co-obligors regarding claims, there is no reason to require an adjustment of the § 502(b)(7) cap when a former employee is paid by way of a letter of credit or any other guarantee arrangement.

Indeed, the provisions regarding co-obligors make sense only if the § 502(b)(7) cap is not reduced by payments from co-obligors. If such payments did reduce the cap, a co-obligor who paid the full amount of the former employee's claim would be stripped of its statutory § 509(a) subrogation and § 502(e) reimbursement and contribution rights, limited though they may be by the cap.

Likewise, the § 509(c) statutory subordination of co-obligor subrogation rights and claims for reimbursement or contribution, could become ephemeral if the § 502(b)(7) cap had to be reduced. For example, in the facts of this appeal, Young's $76,473.73 claim is not covered by the letters of credit. Assuming that the sum claimed is allowed, § 509(c) gives him priority over Bank of America. If the cap were to be reduced to zero because Bank of America honored its letter of credit, the statutory scheme would be frustrated.

CAL. COMM. CODE § 5117(a).

▉ In short, interpreting § 502(b)(7) to require that the cap be reduced to reflect payments by co-obligors would contradict §§ 502(e), 509(a) and § 509(c) and violate the rule that statutes should be interpreted to give each word some operative effect. *Walters v. Metro. Educ. Enter.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997); *Dolven v. Bartleson (In re Bartleson)*, 253 B.R. 75, 80 (9th Cir. BAP 2000).

5

The fact that § 502(b)(6) is interpreted to require that a security deposit in the hands of a lessor be applied to the capped portion of the landlord's claim on a terminated lease does not compel a different conclusion. Two lines of reasoning lead to the same conclusion.

a

First, we agree with our panel in *Bitters,* that § 502(b)(6) provides an unreliable analogy for § 502(b)(7), and thus view security deposits on leases as distinguishable.

Security deposits are peculiar, term-of-art creatures of contract that have a rich history in the specialized field of landlord-tenant law that differentiates them from other lease-related remedies and from employment termination damages. In the classic model, represented by *Oldden,* 143 F.2d at 920, the landlord holds a refundable cash deposit representing a month or two of rent against the possibility of compensable damages to the leasehold property.

Where a letter of credit or other third-party obligation is intended to be a security deposit under a lease, it may be appropriate to analyze the situation as involving a security deposit. The Third Circuit, for example, recently addressed a letter of

credit that was explicitly agreed to be a security deposit on a lease. *PPI Enter.*, 324 F.3d at 209. It does not follow, however, that every letter of credit or other third-party guarantee constitutes a security deposit. Rather, even in the landlord-tenant arena, parties must intend that it be a security deposit.

Thus, we agree with Young and our prior panel in *Bitters* that the claims treatment of security deposits pursuant to leases of real property presents a special situation that does not readily translate to § 502(b)(7).

Since there is nothing comparable to a security deposit present in this appeal—to the extent the § 502(b)(6) security deposit doctrine is different—it does not apply.

b

Nothing, however, about the § 502(b)(6) security deposit doctrine is inconsistent with our general analysis regarding the § 502(b)(7) cap.

The key here is recognizing that a security deposit on a lease is presumptively refundable to the lessee and is not entirely the landlord's property. Hence, it is an interest in property that is property of the estate.

The underlying premise of both the § 502(b)(6) and (b)(7) caps is that the property of the estate will be liable for up to one-year's rent or one-year's compensation of a terminated employee. To the extent the security deposit represents property of the estate, it may be appropriately credited directly against the claim at the time of the filing of bankruptcy.

In any event, we conclude that § 502(b)(7) stands for the proposition that property of the estate will be liable for no more than the cap specified in that section. The § 502(b)(7) cap is not reduced to re-flect payments from co-obligors. The Bankruptcy Code's provisions regarding co-obligors allow for subrogation or for reimbursement or contribution, but only to the extent that the cap is not exceeded and only after the terminated employee's claim is paid in full.

IV

Remand will be necessary to resolve issues left open by the incorrect application of § 502(b)(7). A detailed factual inquiry will dissipate much of the complexity.

The initial step will be to establish precisely what claims are to remain before the court. Elimination of some of the claims may necessitate application of Rule 3006 to determine whether claims should be permitted to be withdrawn and on what terms. Thus, the court should decide whether Taft's claim should be allowed to be withdrawn and, if so, on what terms.

The amounts of the respective § 502(b)(7) caps for Young and Taft (if he remains as a claimant) need to be determined by valuing one year of benefits and adding that sum to the nominal annual salary that was in effect on the dates of their prepetition terminations.

The amounts of their employee termination claims remaining as of the date of the petition also need to be ascertained. The latter task will be complicated by the need to estimate contingent portions of the claims as required by § 502(c).

It will also be complicated by the potential need to determine whether the claim under Young's Consulting Contract is sufficiently factually related to termination so as to constitute an employee termination claim. *Cf. Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 41 (1st Cir.2003).[19]

19. The issue was present, but not resolved, in the First Circuit's *FBI Distribution* decision

Once these matters are determined, the cumulative liability of the estate and of property of the estate on account of employee termination claims—to the former employees and to those who may be able to claim by way of reimbursement, contribution, and related theories—will be able to be fixed.

## CONCLUSION

We conclude that the § 502(b)(7) cap is calculated mechanically as of the date of the filing of the petition and that neither prepetition severance payments nor pre- and postpetition payments by co-obligors (including letter-of-credit issuers) affect the § 502(b)(7) cap. The actual amounts of the claims have not been estimated and determined. Nor has it been determined whether Taft should be allowed to withdraw his claim. Accordingly, we RE-VERSE and REMAND.

where the bankruptcy court had ruled that the Retention Agreement was factually separate from the employment contract and not subject to the § 502(b)(7) cap. The appellant did not raise the issue on appeal, and it was treated as waived. *FBI Distrib. Corp.*, 330 F.3d at 41. We note that Young's Consulting Agreement was entered into after his employ- ment had been terminated, that it called for him to perform different duties, that it designated him as an independent contractor, and that it has different termination terms. We express no view on whether the claim under the Consulting Agreement is, or should be, subject to the § 502(b)(7) cap.