**In re CONNECTIX CORPORATION,
Debtor.**

**No. 05–55648MM.**

United States Bankruptcy Court,
N.D. California.

May 10, 2007.

James A. Tiemstra, Law Offices of James A. Tiemstra, Oakland, CA, for Debtor.

Carol Wu, Pleasant Hill, CA, Elizabeth Murphy, Reidun Stromsheim, Law Offices of Stromsheim and Assoc., for Trustee.

## OPINION AND ORDER ON OBJECTION TO CLAIM

MARILYN MORGAN, Bankruptcy Judge.

### INTRODUCTION

Carol Wu, the Chapter 7 Trustee, has objected to a claim in the amount of $2,335,283.99 that EOP–Peninsula Office Park, the debtor's former landlord, filed against the estate of Connectix Corporation. The Trustee asserts that the correct application of § 502(b)(6) of the Bankruptcy Code limits EOP's recovery to $446,246.99. The debtor and its three major shareholders join in the Trustee's objection. After hearing arguments of counsel and reviewing the parties' submissions, the court sustains the Trustee's objection for the reasons explained below.

### FACTUAL BACKGROUND

Beginning in May 1998, Connectix leased certain business premises from EOP pursuant to a twelve-year commercial lease. Under section 4 of the lease, which is entitled "Security Deposit," Connectix had to provide EOP with a $50,000 security deposit in the form of cash or a letter of credit. Section 4 also required Connectix to deliver an additional "Letter of Credit, pursuant to the provisions contained in Section 36." Section 36, in turn, provided that the requisite letter of credit would, initially, be in the amount of $2,111,205, subject to specified reductions beginning in year five. EOP was entitled to draw the entire amount of the additional letter of credit upon any event of default, but any amount drawn was to be held "as a security deposit, subject to the terms of Section 4." Any unused security deposit was to be returned to Connectix at the expiration or termination of the lease. Connectix maintained a certificate of deposit in an amount that matched the letter of credit at the same bank that issued the letter of credit.

By 2003, Connectix had fallen on hard times, and the company began to liquidate assets and wind up its affairs. In January of that year, Connectix sold substantially all of its assets to Microsoft Corporation. After the proceeds of the sale were released from escrow, the Connectix board of directors approved distributions, involving several million dollars, to its three shareholders. On September 1, 2003, Connectix did not pay the September rent due under to its lease with EOP. Connectix surrendered the premises to EOP on or about September 23, 2003, and the lease was terminated. Due to the lease rejection, EOP claims to have incurred substantive damages exceeding $14 million.

In January and February 2004, EOP made two draws on the standby letter of credit that Connectix had provided pursuant to section 36 of the lease. EOP applied the draws, totaling $1,648,782, against its damage claim. Over the next year, Connectix attempted to negotiate a resolution of its dispute with EOP regarding EOP's lease rejection claim. Then, in January 2005, EOP filed a state court action based both on breach of lease and on fraudulent conveyance related to the 2003 distributions that Connectix made to its

shareholders. Although the parties agreed to mediate their dispute and a mediator was selected, EOP asked for the mediation to be postponed. Shortly thereafter, Connectix filed its chapter 7 petition on September 9, 2005.

EOP has filed a proof of claim against the estate in the amount of $2,335,283.99. It consists of two components. First, EOP claims $161,588.52 in unpaid rent and other charges that became due before EOP recovered the premises in September 2003. This amount is undisputed. The vast majority of EOP's claim, however, is related to the $2,173,695.47 that EOP asserts as its capped claim for future rent reserved under § 502(b)(6)(A) of the Bankruptcy Code.

To calculate the rent reserved portion of its claim, EOP multiplied the dollar amount of all rent that would have become due under the lease from the termination date of September 23, 2003 through the end of the lease's natural term by fifteen percent, resulting in the sum of $2,173,695.47 for future rent. It then added that amount to the $161,588.52 unpaid rent component to arrive at its total claim of $2,335,283.99. EOP did not deduct for the draws on the letter of credit, asserting that the pre-petition draws only reduced its substantive damages, not the capped claim. The Trustee asserts that EOP's capped claim for rent reserved under § 502(b)(6)(A) should be determined by first calculating fifteen percent of the remaining months under the lease following surrender. Then, the future rent claim is equal to the rent that would have become due in that number of months immediately following Connectix's surrender of the premises. Those calculations produce a future rent component in the amount of $1,933,440.47. After adding in the undisputed unpaid rent component, the total capped claim, according to the Trustee, is

$2,095,028.99. From that sum, the Trustee subtracts the draws on the letter of credit to arrive at an allowable claim of $446,246.99.

### LEGAL DISCUSSION

### I. *Ambiguities in § 502(b)(6) Warrant Recourse to the Legislative History to Determine Legislative Intent.*

■ When an objection is filed to a lessor's claim for damages resulting from the termination of a real property lease, § 502(b)(6) of the Bankruptcy Code restricts the amount of the claim that is allowable in bankruptcy. It provides that the court shall not allow the landlord's claim to the extent that the claim exceeds:

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6). The parties, here, dispute whether the term "15 percent" in subsection (A) refers to fifteen percent of the time remaining on the lease from the date of surrender; or, fifteen percent of the total rent that would have become due after the date of surrender. They also disagree as to whether EOP's post-surrender, but pre-petition, draws on the letter of credit that Connectix provided pursuant to section 36 of the lease should be deducted from EOP's allowable claim under § 502(b)(6) or whether the draws simply reduce the total amount of EOP's substantive damages.

That the answers to these questions are not easily ascertainable is apparent from the equal division in the authority on both issues. A number of courts have concluded that the phrase "15 percent" refers to fifteen percent of the total rent due under the remainder of the lease. *See e.g., In re New Valley Corp.*, 2000 WL 1251858, at *11–12 (D.N.J.2000); *In re Andover Togs, Inc.*, 231 B.R. 521, 545–46 (Bankr.S.D.N.Y. 1999); *In re Today's Woman of Florida, Inc.*, 195 B.R. 506, 507–08 (Bankr.M.D.Fla. 1996); *In re Gantos, Inc.*, 176 B.R. 793, 795–96 (Bankr.W.D.Mich.1995); *In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr.S.D.N.Y.1993); *In re Communicall Central, Inc.*, 106 B.R. 540, 544 (Bankr.N.D.Ill.1989). This "total rent" approach is sometimes referred to as the "majority" view, but research reveals that a similar number of courts interpret the phrase as a function of the total time remaining on the lease. *See e.g., In re Blatstein*, 1997 WL 560119, at *15–16 (E.D.Pa. 1997); *In re Allegheny International, Inc.*, 136 B.R. 396, 402–03 (Bankr.W.D.Pa.1991), *aff'd*, 145 B.R. 823, 827–28 (W.D.Pa.1992); *In re Ace Electrical Acquisition, LLC*, 342 B.R. 831, 833 (Bankr.M.D.Fla.2005); *In re Peters*, 2004 WL 1291125, at *6, n. 20 (Bankr.E.D.Pa.2004); *In re Iron–Oak Supply Corp.*, 169 B.R. 414, 419–20 (Bankr.E.D.Cal.1994); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 231 (Bankr. D.N.D.1992). The commentators are also divided. *Compare* Norton Bankruptcy Law and Practice 2d, vol. 2, § 41.24 (2006)(adopting the rent approach without discussion) *with* 4 Collier on Bankruptcy (15th rev. ed.) at ¶ 502.03[7][c] (noting that § 502(b)(6) speaks in terms of time and that the apparent "majority's" use of the rent approach is not in accord with the language of the statute). With respect to the correct application of the letter of credit, the text of § 502(b)(6) is silent on how to apply payments from pre-petition draws against a letter of credit that is serving as a security deposit for a lease. Research discloses that only two reported decisions have considered pre-petition draws on a letter of credit, and the decisions reached contrary results. *Compare In re PPI Enterprises, Inc.*, 324 F.3d 197, 208 (3rd Cir.2003)(letter of credit draw following tenant's premature termination of lease), *with In re Condor Systems, Inc.*, 296 B.R. 5, 13–15 (9th Cir. BAP 2003)(letter of credit draw following employer's premature termination of employment contract).

■ The even split in authority strongly indicates that the text of § 502(b)(6) is less than plain with respect to either of the issues before this court. When statutory ambiguity exists, the legislative intent and history behind the statute may be consulted. *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991); *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *United States v. Lopez*, 484 F.3d 1186, 1204 (2007); *Consejo de Desarrollo Economico de Mexicali, A.C, v. United States*, 482 F.3d 1157(9th Cir.2007). Unlike more recent amendments to the Bankruptcy Code, a wealth of legislative history from 1977 and 1978 provides context and explains Congressional motivations behind § 502(b)(6) and its predecessors.

Prior to 1934, a landlord's claim for future rent damages due to premature lease termination was not recognized in bankruptcy because it was considered contingent and not capable of proof. *See Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 918 (2d Cir.1944)(collecting cases). *Oldden* was one of few decisions interpreting the cap on lease rejection damages that was added to the Bankruptcy Act of 1898. As explained in *Oldden*, Congress used the 1934 and 1938 amendments to the Bankruptcy Act to overcome obstacles that had previously prevented landlords from prov-

ing claims for future rent. At the same time, it placed a ceiling on the measure of a landlord's damages to avoid large and overwhelming claims for unearned rent. *Id.* at 920. The result represented a compromise that enabled landlords to assert some amount as a claim for future rent, but with limited sacrifice on the part of general creditors. *Id.* Following the 1938 amendments, the Bankruptcy Act provided that, in liquidation cases, a landlord's claim would not be allowed in excess of "the year next succeeding" the date of surrender or reentry, which ever occurred first, regardless of whether that date was before or after the petition date. *See* 4 Collier on Bankruptcy at ¶ 502.LH[3][a]. In rehabilitation cases, the amendments limited claims to "the three years next succeeding" surrender or reentry. *Id.*

When Congress drafted the 1978 Bankruptcy Code, it carried forward the limitations on landlords' claims for lease rejection damages from the Bankruptcy Act. The Report of the House Judiciary Committee on the original version of H.R. 8200 specifically referenced *Oldden's* detailed review of the history of the limitation on landlord claims, and then went on to explain that the cap on landlords' damages was "designed to compensate the landlord for his loss while not permitting a claim so large . . . as to prevent other general unsecured creditors from recovering a dividend from the estates. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or 10% of the remaining lease term, not to exceed three years after the earlier of" the petition date or the date of surrender or repossession. H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6448, *reprinted in* Collier on Bankruptcy, vol. C, App. Pt. 4(d)(i). The House Judiciary Report also noted that the new ten percent formula replaced the Act's

dual provisions allowing recovery of three years' rent in reorganization cases and one year in liquidation cases. The House Judiciary Report further observed that the provision capping landlords' lease rejection damages did not

> overrule *Oldden,* or the proposition for which it has been read to stand: to the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. . . . As under *Oldden,* he will not be permitted to offset his actual damages against his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

*Id.* These comments accompanied H.R. 8200 when it went to the Senate for consideration.

The Senate's amended version of the 1978 bankruptcy bill, for the most part, accepted the House's version of the limitation on landlords' lease rejection damages, but it retained the Bankruptcy Act's one year/three year distinction between liquidation and rehabilitation cases. S.Rep. No. 989, 95th Conf., 2d Sess. 63 (1978), *reprinted in* Collier on Bankruptcy, vol. D, App. Pt. 4(e)(i). Eventually, a compromise was reached. Introducing the compromise bill, Congressman Don Edwards noted that the modified version of H.R. 8200 contained the House's original cap on landlords' lease rejection damages but increased the percentage calculation from ten to fifteen percent. Explaining the decision to retain the Bankruptcy Act's limit on landlord's damages, Congressman Edwards commented that, historically, it was "considered equitable to limit the claims of real estate lessor[s]." 124 Cong. Rec. H11,094 (daily ed. Sept. 28 1978), *reprinted in,* Colliers, Vol. D, at App. Pt.

4(f)(i)(comments of Congressman Edwards). He observed that two considerations led to that belief. First, as a matter of history, damages upon breach of a real estate lease were viewed as contingent and difficult to prove. Second, in leasing transactions, "the lessor retains all risks and benefits as to the value of the real estate at the termination of the lease." *Id.* In other words, the lessor re-takes full possession of the property once the lease is terminated. Both the House and the Senate enacted H.R. 8200 as modified and it appears today as § 502(b)(6) of the Bankruptcy Code.

## II. Under § 502(b)(6)(A), the Amount of the Landlord's Capped Claim is Calculated Using the Next Succeeding 15% of the Time Remaining through the Natural End of the Lease.

▆▆▆ Based on the language and the legislative history of § 502(b)(6), it is apparent that the fifteen percent calculation is a function of time, not the remaining rent due under the lease. This conclusion is in keeping with the most ordinary reading of the statute. Absent the qualifier setting a maximum term, the statute states that the court must look to fifteen percent of "the remaining term of such lease." Common use of the phrase "the term of a lease," refers to the length of a lease based on a measure of time, not an amount of rent. Thus, the statutory directive to calculate fifteen percent of the remaining *term* most naturally requires a calculation of time. Other references to time in § 502(b)(6)(A) bolster this temporal interpretation. First, the section instructs that the fifteen percent calculation must be based on the remaining term that *follows,* or comes after, the earlier of two dates. Additionally, the section sets both a minimum and a maximum period of *time* for which a claim of future rent will be allowed. At a minimum, a landlord will be

allowed a claim for the rent that would have come due during the first year following the applicable trigger date, and, at a maximum, the rent that would have come due during the three years immediately following the applicable trigger date. Finally, the statutory mandate to compute rent reserved "without acceleration" further confirms that fifteen percent calculation is a function of time. If rent reserved were computed based on rent that would have come due under the remainder of the lease, then the calculation necessarily would "accelerate" and take into account future rent increases that had not yet occurred.

The legislative history also indicates that the fifteen percent calculation is an operation of time. As noted above, the percentage calculation was intended to replace the dual time provisions employed in the Bankruptcy Act. There is no indication, however, that Congress intended to move away from calculating the cap based on the rent that would become due within a time period immediately succeeding the statutory trigger date. Because there is no clear expression of an intent to change from a time approach to a "total rent" based formula, it cannot be presumed that Congress intended to make that shift. *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 227, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957)("no changes in law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed."). Further, the House Judiciary Report explaining the then ten percent calculation confirms that it is a computation of time. It stated that "[t]he damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or *10% of the remaining lease term,* not to exceed three years *after* the earlier of" the petition date or the date of

surrender or repossession. H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5849, *reprinted in* Collier on Bankruptcy (15th Rev. Ed.), vol. C, App. Pt. 4(d)(i) (emphasis added).

The time approach also better serves the economic forces that Congress was trying to address when it enacted the landlord damage cap. Some courts have reasoned that the rent approach more closely approximates a landlord's expectation damages by allowing the landlord to take advantage of bargained for rent increases. *See e.g., Gantos,* 176 B.R. at 795–96. However, neither the statute nor the legislative history suggest that Congress intended to approximate landlords' expectation damages. To the contrary, the statute speaks in terms of rent due, "without acceleration." Further, Congressman Edwards specifically identified the economic considerations that led to the enactment of § 502(b)(6). Although Congress wanted to continue the Bankruptcy Act's decision to give landlords some claim for future rent in bankruptcy, it also recognized the historical belief that it was equitable to limit the claims of landlords. The legislative history indicates that Congress started from the premise that, historically, landlords had no claim at all. It was also influenced by the fact that landlords, unlike other general unsecured creditors, have added protection at the termination of a lease arrangement. Landlords get the property back. As one court concluded, § 502(b)(6) provides landlords with a certain period of time to relet their property. If successful, the landlord suffers no real economic detriment, because reletting the premises restores the landlord to the position it was in prior to lease termination. *See In re Allegheny International, Inc.* 136 B.R. at 402, *aff'd,* 145 B.R. 823 (W.D.Pa.1992).

■ Because the parties agree that Connectix surrendered the leased premises on or about September 23, 2003, nearly two years prior to the petition date, the surrender date is the operative date for determining the amount of EOP's allowable claim under § 502(b)(6). For the reasons explained, EOP's allowable claim for future rent is equal to the rent that would have become due during fifteen percent of the months remaining under the lease immediately following surrender. The resulting number must then be added to EOP's claim for past due rent under § 502(b)(6)(B). According to the Trustee's calculations, which are based on the time approach and are not disputed mathematically, this results in a claim for future rent of $1,933,440.47. After adding in the undisputed amount of $161,588.52 attributable to unpaid past due rent, EOP's total capped claim under § 502(b)(6) is $2,095,028.99. The remaining question is whether the $1,648,782 that EOP has already received from draws on the letter of credit should further reduce that claim.

### III. Under § 502(b)(6), Pre-petition Draws on a Letter of Credit Serving as a Security Deposit Will Reduce the Landlord's Allowable Claim in Bankruptcy.

■ As the Ninth Circuit has recognized, § 502(b)(6) provides no explicit guidance as to whether security deposit proceeds should be applied to a landlord's gross damages or its allowed claim and, therefore, the statute is ambiguous. *In re AB Liquidating Corp. (AMB Property, L.P. v. Official Creditors),* 416 F.3d 961, 964 (9th Cir.2005). As a result, the court looked to the legislative history and its "explicit endorsement of *Oldden* " for assistance. *Id.* The House Judiciary Report on H.R. 8200 expressly refers to the *Oldden* case, a case under the Bankruptcy Act

that concludes that security deposits should be applied against the landlord's capped claim rather than its total damages. *Oldden,* 143 F.2d at 920–21. The House Judiciary Report states that the proposed cap on a landlord's lease rejection damages was not intended to overrule or change the outcome of *Oldden.* It explained that "under *Oldden,* [a landlord] will not be permitted to offset his actual damages against his security deposit and then claim for the balance under [§ 502(b)(6)]. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under [§ 502(b)(6)]." In light of this congressional endorsement, the Ninth Circuit refused to reject *Oldden's* holding and concluded that under the facts before it, namely, post-petition draws on a letter of credit security deposit, the letter of credit proceeds received by the landlord were properly subtracted from the landlord's allowed claim. *AB Liquidating,* 416 F.3d at 965. Relying on that same legislative history, the Third Circuit has held that proceeds received from post-surrender but pre-petition draws on a letter of credit security deposit also reduce a landlord's allowed claim. *In re PPI Enterprises (U.S.), Inc. (Solow v. PPI Enterprises (U.S.), Inc.),* 324 F.3d 197 (3d Cir. 2003). In *PPI,* as in the instant case, the debtor surrendered its lease several years prior to the date of its bankruptcy petition. In the interim, PPI's landlord, like EOP here, drew down the letter of credit that PPI had provided as a security deposit. The Third Circuit reasoned that under § 502(b)(6), the amount of the landlord's allowable claim must be calculated as of the date the lease was surrendered. Therefore, any proceeds received following surrender should be applied against the capped claim. I agree with the Third Circuit and conclude that, under the facts of this case, EOP's post-surrender, but pre-petition draws on the letter of credit secu-

rity deposit provided by Connectix are to be applied against EOP's allowable claim in bankruptcy.

EOP's reliance on *In re Condor Systems, Inc.,* 296 B.R. 5 (9th Cir.BAP), does not persuade me otherwise. In *Condor,* the Bankruptcy Appellate Panel for the Ninth Circuit considered whether pre-petition severance payments reduce the one-year cap on claims by terminated employees set forth in § 502(b)(7), and further whether a stream of pre- and post- petition severance payments under a letter of credit reduce that same cap. *Condor,* 296 B.R. at 10. Because the appellate panel answered "no" to both questions, some might try to extend *Condor's* holding to find that pre-petition draws on letter of credit security deposits under § 502(b)(6) should not be applied against the allowed amount of a landlord's claim. But the court in *Condor* discouraged any such extension of its reasoning. In considering the letter of credit issue, the appellate panel noted the similarity in the language between § 502(b)(6) and § 502(b)(7), but took care to explain that letters of credit serving as security deposits on real property leases are unique creatures with an extensive history that differentiates them from letters of credit established to secure payment of employment termination damages. *Id.* at 18–19. In light of that distinction, the court concluded that the treatment of security deposits under § 502(b)(6) simply did not apply to the employment termination case before it. *Id.*

Others might try to extend *Condor's* discussion of the word "unpaid" in § 502(b)(7) to § 502(b)(6) security deposit cases. In *Condor,* the court reasoned that certain pre-petition severance payments did not apply against an employee's capped claim based on the appearance of the word "unpaid" in § 502(b)(7)(B), but not in § 502(b)(7)(A). I do not find *Con-*

*dor's* reasoning persuasive in the case before me. It is true that the word "unpaid" appears in § 502(b)(6)(B), which deals with unpaid past due rent, but does not appear in § 502(b)(6)(A), which controls the calculation of future rent reserved. However, in the § 502(b)(6) context, future rent reserved is, by definition, unpaid at the time of the calculation of the cap. There simply was no need for Congress to include the word "unpaid" in § 502(b)(6)(A).

In fact, *Condor's* discussion of security deposit letters of credit reinforces the conclusion that EOP's post-surrender, but pre-petition draws on the letter of credit security deposit provided by Connectix are to be applied against EOP's allowable claim in bankruptcy. According to *Condor,* when a letter of credit secures payment of a real property lease, the key question is whether it is intended to be a security deposit such that any draw against the letter of credit will have an impact on property of the estate. *Id.* at 19. *Accord In re Mayan Networks Corp.,* 306 B.R. 295, 306 (9th Cir.BAP 2004)(Klein, J., concurring). Here, the letter of credit at issue was clearly intended to be a security deposit. The lease first mentions the letter of credit in a paragraph entitled "Security Deposit." Further, the lease explicitly states that any draws on the letter of credit are to be treated as additional security deposit. Finally, counsel for Connectix verified at the hearing that Connectix had established a certificate of deposit in the same amount as the letter of credit at the same bank that issued the letter of credit. Under similar facts, both the appellate panel and the Ninth Circuit have concluded that a letter of credit was intended to be and should be treated as a security deposit because draws against the letter of credit would have an effect on property in the debtor's estate. *See AB Liquidating,* 416 F.3d at 965; and, *Mayan Networks,* 306 B.R. at 301.

For the reasons explained, the $1,648,782 that EOP took in pre-petition draws on the letter of credit security deposit from Connectix is to be applied against its capped claim of $2,095,028.99, leaving an allowable claim of $446,246.99.

*Conclusion*

The Chapter 7 Trustee's objection to the claim of EOP–Peninsula Office Park is sustained and EOP–Peninsula Office Park's claim is allowed in the reduced amount of $446,246.99.

Good cause appearing, IT IS SO ORDERED.