In re MAYAN NETWORKS
CORPORATION,
Debtor.

Redback Networks, Inc., Appellant,

v.

Mayan Networks Corporation; David Judd, as the Estate Manager of Reorganized Debtor, Appellees.

BAP No. NC–02–1483–JRyK.
Bankruptcy No. 01–55393–ASW.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Feb. 20, 2003.

Filed Feb. 5, 2004.

Randy Michelson, Bingham McCutchen LLP, San Francisco, CA, for Redback Networks, Inc.

Margaret P. Sheneman, Murphy, Sheneman, Julian & Rogers, San Francisco, CA, for David Judd, Estate Manager of Reorganized Debtor.

Before JONES,[1] RYAN, and KLEIN, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge.

Appellant appeals from the bankruptcy court's order determining that a draw upon a letter of credit given as security for a lease should reduce the amount of Appellant's allowed claim under 11 U.S.C. § 502(b)(6).[2]

We AFFIRM.

### I. Facts

In January 2000, Mayan Networks Corporation (the "Debtor") and Redback Networks, Inc. (the "Landlord") entered into a sublease of a large commercial building. The Debtor delivered to the Landlord two forms of security for the sublease: (1) cash of $351,033 and (2) a $648,966 letter of credit issued by Silicon Valley Bank. The sublease specifically provided that the letter of credit was delivered "as security for the faithful performance by [Debtor] of all of [Debtor's] obligations under this Sublease." Sublease, January 2000, at 2. The Sublease also provided that, "[t]he Sublease Letter of Credit, or so much thereof as remains after the curing of any default . . ., shall be returned to [Debtor] at the expiration of the term of this Sublease and surrender of the Premises by [Debtor]."

*Id.* at 3. The Debtor pledged over $650,000 cash to the bank to secure the letter of credit.

On November 5, 2001, the Debtor filed its Chapter 11 petition and shortly thereafter moved to reject the sublease. The Landlord filed a general unsecured claim for damages arising from the rejection of the sublease and an administrative claim for post-petition rent. The Debtor and the Official Committee of Unsecured Creditors (the "Committee") objected to the Landlord's claim. Prior to the hearing on the objection to claim, the Landlord agreed to apply its cash security deposit to reduce its allowed claim as capped by § 502(b)(6).

The Landlord, the Debtor, and the Committee stipulated that the Landlord's remaining unsecured claims consisted of an undisputed claim and a disputed claim. The undisputed claim was for $1,701,535, which represented $339,203 for pre-petition rent, plus one year's rent of $1,362,331 as reduced by the application of the cash security deposit. The disputed claim was for the $648,966 drawn on the letter of credit.

The bankruptcy court determined that the money received from the draw on the letter of credit should be applied toward the allowed claim, thereby reducing the Landlord's unsecured claim against the bankruptcy estate. This appeal followed.

### II. Issue

Section 502(b)(6) limits the amount of damages that a landlord can claim for early termination of a lease. The issue on this appeal is whether a landlord's draw upon a letter of credit offered as security

---

1. Hon. Robert C. Jones, United States Bankruptcy Judge for the District of Nevada, sitting by designation.

2. Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

for a lease will be applied in partial satisfaction of the allowed claim.

### III. Standard of Review

■ The only issues presented by this appeal are issues of law. The Bankruptcy Appellate Panel "reviews issues of law under the de novo standard ...." *Shook v. CBIC (In re Shook),* 278 B.R. 815, 821 (9th Cir. BAP 2002).

### IV. Discussion

#### A. THE LANGUAGE OF THE STATUTE

Section 502(b) states that,

if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds-

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease ....

11 U.S.C. § 502(b)(6).

■ The plain meaning of a statute is conclusive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation and internal quotation marks omitted). Here, it is clear that a court shall allow a claim by a landlord so long as the amount of the claim does not exceed one year's rent. However, no mention is made in the text as to whether security deposits are part of "such claim,"

the amount of which is limited by § 502(b)(6). *See In re Handy Andy Home Improvement Ctrs. Inc.,* 222 B.R. 571, 574 (Bankr.N.D.Ill.1998). The ambiguity that creates the issue for this appeal is whether the claim that shall be allowed is the total amount of damages that a landlord may recover or the amount that the landlord may claim against the bankruptcy estate in addition to any security that has been recovered. With such an ambiguity on the face of the statute, the court must resort to legislative history. *Id.*

The legislative history states that the provision "limits the damages allowable to a landlord of the debtor," and that the purpose of the statute is "to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend of the estate." S.Rep. No. 95–989, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849; H.R.Rep. No. 95–595, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309. The history also states that a landlord's "allowed claim is for his total damages, as limited by this paragraph," and that "the claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds is less than his damages." *Id.*

The legislative history specifically endorses the Second Circuit case of *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2d Cir.1944), which requires that a security deposit counts toward the total claim of a landlord. In *Oldden,* the court held that $3,000 deposited as security for a lease should be deducted from the claim after the statutory limit had been applied. *Id.* In agreeing with the holding of *Oldden,* the legislative history of § 502(b)(6) states that the landlord "will not be permitted to offset his actual damages against his security deposit and then claim for the balance

under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph." H.R.Rep. No. 95–595; S.Rep. No. 95–989, U.S.Code Cong. & Admin.News 1978, 5787, 5963, 5849–50, 6310.

■ It is clear that security deposits are to be applied after the § 502(b)(6) cap, thereby reducing the unsecured claim that a landlord may have against the estate. The question is left as to whether the letter of credit will be treated like a security deposit for the purposes of calculating the amount of a landlord's claim under § 502(b)(6).

## B. LETTERS OF CREDIT AND THE INDEPENDENCE PRINCIPLE

One of the central arguments made by the Landlord is that a draw on a letter of credit does not reduce the allowed claim because neither the letter of credit nor its proceeds are property of the estate. The obligation of a bank to honor a letter of credit is independent of the underlying contract. The Landlord argues that since the letter of credit is not property of the estate and the bank's obligation to pay on the letter of credit is independent of the debtor's obligation to reimburse the bank, the landlord should be able to apply the proceeds from the letter of credit to the damage claim before application of the cap in § 502(b)(6).

■ The standby letter of credit is a commercial instrument that obligates the issuer to pay the beneficiary upon presentation of certain documents, proving that the customer has defaulted on its obligation. *Andy Marine, Inc. v. Zidell, Inc.,* 812 F.2d 534, 536 (9th Cir.1987). The issuer's obligation under the letter of credit is independent of the˙ underlying contract. Cal. Comm.Code § 5103(d); *Hamada v. Far East Nat'l Bank (In re Hamada),* 291 F.3d 645, 650 (9th Cir.

2002). Thus, the issuer's obligation "does not depend on the fact of default, but upon the presentation of documents as evidence of default." *Andy Marine,* 812 F.2d at 536. As a result of the independence of letters of credit from their underlying contracts, neither the letter of credit nor its proceeds are property of the debtor's bankruptcy estate. *See Musika v. Arbutus Shopping Ctr. Ltd. P'ship (In re Farm Fresh Supermarkets of Md., Inc.),* 257 B.R. 770, 772 (Bankr.D.Md. 2001).

■ However, as the court below pointed out, the fact that letters of credit themselves are not property of the estate is a red herring. There is nothing in the statute or in case law that suggests that the limitation in § 502(b)(6) applies only to amounts that are paid directly from property of the estate. Rather, the appropriate analysis looks to the impact that the draw upon the letter of credit has on property of the estate. Here, the $650,000 cash pledged to the Bank was property of the estate, and it was used in effect to pay the landlord.

In *Solow v. PPI Enters., Inc. (In re PPI Enterprises, Inc.),* 324 F.3d 197 (3d Cir. 2003), the debtor defaulted on a lease with eight years remaining on the lease, and the landlord subsequently made a $650,000 draw upon a letter of credit which had been given as security for the lease. *Id.* at 200. Almost five years later, on the eve of a trial to determine damages for the debtor's breach, the debtor filed its Chapter 11 petition. *Id.* at 201. The landlord argued that the letter of credit was independent of his claim against the debtor, and thus should not be applied to reduce his § 502(b)(6) claim. *Id.* at 209. The Third Circuit disagreed, noting that the letter of credit was intended as a security deposit and the debtor would be liable to the land-

lord for replenishment of the security if the landlord were forced to draw upon the letter of credit. *Id.* at 209–10. The court also noted that once the letter of credit was drawn down, the bank could pursue recovery of its loss against the debtor. *Id.* at 209. If the full amount of the claim were allowed under such circumstances, the court reasoned, the letter of credit would result in an "end run" around the § 502(b)(6) cap. *Id.* Therefore the court followed the rationale of *Oldden. Id.*

In the recent case of *In re Condor Systems, Inc.*, 296 B.R. 5 (9th Cir. BAP 2003), we held that a draw upon a letter of credit did not reduce the allowed claim of an employee under § 502(b)(7). In *Condor,* the employee was terminated 21 months prepetition. The employment agreement provided the employee a $350,000/year base salary and a severance package of $1,400,000, payable in eight quarterly installments. The $1,400,000 was funded by an irrevocable letter of credit issued by Bank of America. The employee had drawn $1,050,000 prepetition, and he ultimately drew the remaining $350,000 on the letter of credit. The bankruptcy court reduced the employee's § 502(b)(7) claim by the $1,400,000 he had drawn on the letter of credit. On appeal, we reversed the bankruptcy court because the § 502(b)(7) cap should not be reduced by payments from co-obligors if there is no impact on the estate.

In *Condor,* the debtor did not provide security to the bank, and there was no adverse impact on the estate by the drawdowns on the letter of credit. Thus, the relationship between the parties in *Condor* was more analogous to a third-party guarantee than to a security deposit. Several cases have held that the liability of a guarantor that is not in bankruptcy is not limited by section § 502(b)(6). *See, e.g., Kopolow v. P.M. Holding Corp. (In re Modern Textile, Inc.)*, 900 F.2d 1184 (8th Cir.1990); *Bel–Ken Assocs. Ltd. P'ship v. Clark,* 83 B.R. 357 (D.Md.1988); *Things Remembered, Inc. v. BGTV, Inc.,* 151 B.R. 827 (Bankr.N.D.Ohio 1993). As the court in *Bel–Ken* noted, "common sense dictates that the guarantor remain fully liable even when the principle debtor seeks relief under the Bankruptcy Code. After all, what good is a guaranteed lease if the guarantor escapes liability when the debtor does?" *Bel–Ken,* 83 B.R. at 359.

In light of *Condor,* we do not follow the rationale of *PPI Enterprises* where the debtor did not pledge property of the estate to secure the letter of credit. However, the present case is distinguishable from *Condor* and the guarantee cases, because we do not have a true third party obligor who bears substantial risk. The Bank was fully protected if it had to pay on the letter of credit. Inserting the Bank between the Landlord and the Debtor did not change the true nature of this arrangement, which was to have Debtor provide a security deposit on the lease. The $650,000 cash security to the Bank was property of the estate and the structure of this arrangement was really an attempt to circumvent *Oldden.* Accordingly, the logic of *Oldden* should apply.

## C. EQUIVALENCE OF THE LETTER OF CREDIT TO A SECURITY DEPOSIT

As the court explained in *Oldden,* "in the light of [the] history and purpose of the statutory provision and its clearly expressed intent, we should construe it so as to give it full force and effect, and not allow it to be nullified by crafty draftsmanship in particular leases." *Oldden,* 143 F.2d at 920. As the court below pointed out, although *Oldden* expressly deals only with security deposits, the rationale of *Oldden* applies to anything that is equiva-

lent to a security deposit. In fact, a "security deposit" is not limited to cash only. If the collateral would come back to the Debtor, but for the existence of the pledge of security, then it is a security deposit for the purposes of this analysis.

On the facts of this case, the letter of credit is in the nature of a security deposit. The lease itself described the letter of credit as "security" for the tenant's obligations under the lease. Although the words "security deposit" are not used, the principles of *Oldden* still apply. From the standpoint of the Debtor's other creditors, the letter of credit has the same effect as a cash security deposit. That is, the amount of money left in the estate to pay unsecured claims is reduced by $650,000. Meanwhile, the landlord has received the full amount of its secured claim, from both the cash security deposit and from the letter of credit.

In this case, the Debtor pledged $1 million as security for its lease. Of that amount, $350,000 was given to the landlord, and $650,000 was deposited in a bank, with a letter of credit then being issued by the bank. The only effective difference between the letter of credit and the cash security deposit was the location of the funds. To allow the landlord to obtain an advantage simply by keeping the money pledged as security in the tenant's bank would defeat the purpose of § 502(b)(6).

## V. Conclusion

Letters of credit have yet to find a comfortable place in bankruptcy law. However, it is not necessary to distinguish the letter of credit in this case from the security deposit in *Oldden*. Here, the language of the lease described the letter of credit as security for the lease and the letter of credit was fully secured by a cash deposit. The draw upon the letter of credit had the same effect on the estate as the forfeiture of a cash security deposit, and

the purposes of § 502(b)(6) will be best served if the same rule is applied. Therefore, the draw upon the letter of credit will be applied in satisfaction of the landlord's claim against the debtor and the amount of such a claim will be reduced by the amount of the draw.

AFFIRMED.

KLEIN, Bankruptcy Judge, Concurring.

I concur in the result and write separately, first, to make clear that the theory underlying our disposition of this appeal is based on applying the terms of the Bankruptcy Code rather than mere reliance on *Oldden v. Tonto Realty Corp.* as precedent and, second, to highlight a recent change to the Uniform Commercial Code that eviscerates decisions holding that § 509 subrogation rights are not available to issuers of letters of credit.

I agree with the majority that the underlying principle is, as explained in *Condor*, that the caps under §§ 502(b)(6) & (7) limit the estate's liability under any theory (secured or unsecured) to the amounts specified by Congress and that, in light of the provision in § 524(e) that a discharge does not affect the liability of any other entity on the debt, the caps cannot be construed to reduce what landlords and former employees can recover from sources other than property of the estate.

Fears that one might circumvent the cap by way of so-called "credit enhancements" provided by letters of credit are misplaced once one realizes that a letter of credit is merely a powerful guaranty in which the issuer winds up with the same bankruptcy rights as other guarantors and often is in the same unhappy position as a guarantor holding security from the debtor.

The majority's assertion that § 502(b)(6) is ambiguous and requires resort to legislative history to ascertain the treatment of

security deposits is pure obiter dictum that is unnecessary to our decision. Section 502(b)(6) appears to be ambiguous only when considered in isolation from the rest of the statutory scheme. In the end, interrelated Code provisions pertinent to property of the estate, disallowed claims, restrictions on rights of guarantors, indemnitors and subrogees, turnover obligations, and limitations on setoff rights give us the answer.

Although the results under the Bankruptcy Code and the Second Circuit's *Oldden* decision dating from 1944 that is mentioned in the legislative history coincide whenever (as is typical) the security deposit is property of the estate because the refund obligation flows to the estate, *Oldden* merely informs the analysis and, because it cannot trump the Bankruptcy Code, cannot be binding precedent.

The reason for sounding a note of caution about too much reference to *Oldden* is that an untutored reliance on *Oldden* leads to a temptation to extend *Oldden* to situations in which the security deposit is not part of the estate and thereby stray into error. If the security deposit is not property of the estate, then it would not apply against the § 502(b)(6) cap.

### Facts

This appeal is difficult to comprehend without more detailed facts regarding the terms of the security deposit and whether it must be returned to the debtor (hence, the estate) if all lease obligations are performed.

3. Section 21 of the Master Lease includes the following:

> If Tenant shall perform all of its obligations under this Lease and return the Premises to Landlord at the end of the Term, Landlord shall return all of the remaining Security Deposit and/or Additional Security Deposit to Tenant within thirty

In January 2000, Mayan Networks Corporation (the "Debtor") and Redback Networks, Inc. ("Landlord") entered into a five-year sublease of a 95,000 sq. ft. commercial building.

The sublease incorporated the terms and rent from the master lease, which included a variable rent schedule that included an annual base rent of $1,935,429.60 for 2001, plus common area charges and utilities.

The sublease required a $1 million security deposit, consisting of $351,033.80 cash and an unconditional irrevocable standby letter of credit for $648,966.20, "naming [Landlord] as beneficiary thereunder, as security for the faithful performance by [Debtor] of all of [Debtor's] obligations under this Sublease," and required the Landlord to comply with the provisions of the master lease regarding return of the security deposit after the end of the lease term.

The master lease required that the unused balance of the security deposit be returned to the tenant within thirty days after the term ended and that the security deposit was neither an advance payment of rent nor a measure of damages for default.[3]

The Debtor obtained the required $648,966.20 letter of credit in favor of Landlord, which was issued by Silicon Valley Bank on February 20, 2000, and pledged to the bank as security over $650,000.00 on deposit with the issuer.

> (30) days after the end of the Term. Neither the Security Deposit nor the Additional Security Deposit shall serve as an advance payment of Rent or a measure of Landlord's damages for any default under this Lease.

Master Lease, July 19, 1999, at 29–30, § 21.

On November 5, 2001, the Debtor filed a Chapter 11 petition and promptly rejected the sublease.

The Landlord filed a claim for lease rejection damages calculated at $2,701,535.14 (including $339,203.26 in unpaid prepetition rent) in accordance with the cap prescribed by § 502(b)(6), and also claimed a right to administrative rent of $52,496.24 for eight days of postpetition occupancy.

On March 18, 2002, the Landlord drew the full $648,966.20 on the letter of credit. The letter communicating the request for draw included the certification required by the letter of credit that "[t]his is to Certify that landlord will hold the funds drawn under this letter of credit as security deposit for tenant or apply said funds to tenant's obligation under the lease." [4]

The Debtor and the Official Committee of Unsecured Creditors ("Committee") objected to the Landlord's claim on March 22, 2002.

Prior to the hearing on the objection to claim, the Landlord, the Debtor, and the Committee stipulated that $2,701,535.14 is the correct measure of the § 502(b)(6) cap, that the $351,033.80 cash portion of the security deposit should be credited against that sum, and that the balance of the dispute related to whether the portion of the security deposit provided by the $648,966.20 letter of credit had to be credited against that capped sum.

The Bankruptcy Court sustained the objection to claim, ruling on August 22, 2002, that the $648,966.20 letter of credit had to be credited against the capped claim, with the consequence that the net unpaid balance of the allowable § 502(b)(6) claim was $1,701,535.14. This appeal followed.

## I

I do not agree with the majority in Part IV–A of the opinion, which asserts that § 502(b)(6) is sufficiently ambiguous to warrant resort to legislative history, that the legislative history says that *Oldden* remains good law, and therefore that *Oldden* controls.

I submit that the Bankruptcy Code is not ambiguous when one considers interrelated provisions. Rather than preserving *Oldden* as controlling authority, the Code achieves the *Oldden* result whenever the security deposit is property of the estate.

In this context, the references in legislative history to *Oldden* should be understood to constitute assertions that the overall scheme of the Code (taking into account other provisions) achieves the *Oldden* result. It is one thing to say that a knowledge of *Oldden* is important to understand the intellectual history of the pro-

---

**4.** The relevant portions of the letter of credit provided:

> We hereby establish our irrevocable standby letter of credit No. SVB00152076 in your favor available by your drafts drawn on us at sight and accompanied by the following documents:
> 1. The original of this letter of credit and all amendment(s), if any.
> 2. A dated certification signed by an authorized officer of the beneficiary, followed by its designated title, stating the following:
> (A) [certification that default has occurred and landlord is authorized to draw down on the letter of credit]. And

> (B) "This is to certify that landlord will hold the funds drawn under this letter of credit as security deposit for tenant or apply said funds to tenant's obligation under the lease."
> . . .
> This letter of credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce.

Irrevocable Standby Letter of Credit No. SVB 00152076.

vision and that the new Code is constructed in a manner that preserves the result in *Oldden* when the facts are the same as in *Oldden.* It is quite another thing to say that *Oldden* is binding in a more general manner so as to trump inconsistent provisions of the Bankruptcy Code.

This is an occasion where it is important to pay attention to the Supreme Court's admonition that the meanings of discrete Bankruptcy Code provisions be assessed with "holistic" analysis:

> [V]iewed in the isolated context of § 362(d)(1), the phrase could reasonably be given the meaning petitioner asserts. Statutory construction, however, is a holistic endeavor. *A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.* That is the case here. Section 362(d)(1) is only one of a series of provisions in the Bankruptcy Code dealing with the rights of secured creditors. The language in those other provisions, and the substantive dispositions that they effect, persuade us that the "interest in property" protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure.

*United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (Scalia, J.) (emphasis supplied).

What looks like ambiguity when § 502(b)(6) is viewed in isolation is clarified by other Bankruptcy Code provisions.

The interplay of the pertinent interrelated provisions of the Bankruptcy Code is best seen by considering several hypothetical situations.

### A

*Two–Party Landlord–Tenant Situation: Security Deposit Less than § 502(b)(6) Cap.* Consider, first, the simple two-party landlord-tenant situation in which no other person is involved and the security deposit is less than the amount allowable under the § 502(b)(6) cap. This is the most common security deposit situation and was the situation in *Oldden.*

The tenant provides the security deposit (its own property) required by the lease, which lease terms ordinarily (as in this appeal[5]) require it to be refunded after faithful performance of the lease. The tenant's right to a refund is property in the sense of § 541 in the tenant's bankruptcy case and, hence, is property of the estate.[6]

As property of the estate, the security deposit is required to be turned over to the trustee under § 542(b) once it becomes due (as when the lease is terminated or expires during the bankruptcy), subject, per § 542(b), to offset under § 553.

---

**5.** The security deposit clause in the lease involved in this appeal is typical:

> If Tenant shall perform all of its obligations under this Lease and return the Premises to Landlord at the end of the Term, Landlord shall return all of the remaining Security Deposit and/or Additional Security Deposit to Tenant within thirty (30) days after the end of the Term. Neither the Security Deposit nor the Additional Security Deposit shall serve as an advance payment of Rent of a measure of Landlord's damages for any default under this Lease. Master Lease, at 29–30, § 21.

**6.** H.R.Rep. No. 95–595 and S.Rep. No. 95–989, U.S.Code Cong. & Admin.News 1978, 5787, 5868, 5963, 6323, each say, "the right to a refund is property of the estate."

Section § 553(a)(1) forbids setoff to the extent the claim is disallowed. Since any claim in excess of the § 502(b)(6) cap is disallowed, offset is only permitted against the allowed portion of claim. This is why the legislative history statement that the security deposit must be applied against the allowed claim is accurate.

Under the terms of § 502, the landlord's claim for rent is disallowed by § 502(b)(6) to the extent it exceeds the cap stated in that section. In addition, § 502(d) temporarily disallows the landlord's claim in its entirety until all funds owed by the creditor under § 542 (in any capacity) and ineligible for offset are actually paid to the trustee. Thus, once the security deposit refund obligation is triggered by termination of the lease, the security deposit must be refunded to the tenant's bankruptcy estate, but can be set off under § 553 to the extent there is an allowed claim (i.e. to the extent of the § 502(b)(6) cap). The automatic temporary disallowance per § 502(d) operates to require that the offset actually be accomplished before the balance of the allowable § 502(b)(6) capped claim can be paid.

Since this analysis involves the precise situation as *Oldden* and reaches the same result, it is accurate to say that the result in *Oldden* is preserved.

## B

*Two–Party Landlord–Tenant Situation: Security Deposit More than § 502(b)(6) Cap.* The Bankruptcy Code also provides a result for when the tenant provides a security deposit that exceeds the § 502(b)(6) cap: offset may be taken with respect to the amount of the capped claim, and the balance must be turned over to the estate under § 542, regardless of whether the landlord's claim is secured or unsecured, and all claims of the landlord in all capacities are temporarily disallowed under § 502(d) until the surplus is paid into the estate.

Both of these scenarios—the security deposit greater and less than the cap—are described in the second paragraph of the legislative history statement in the House and Senate reports:

> This paragraph will not overrule *Oldden*, or the proposition for which it has been read to stand: to the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. Moreover, his allowed claim is for his total damages as limited by this paragraph. By virtue of proposed 11 U.S.C. § 506(a) and 506(d), the claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds [is] less than his damages. As under *Oldden*, he will not be permitted to offset his actual damages against his security deposit and then claim for the balance.

H.R.Rep. No. 95–595; S.Rep. No. 95–989, U.S.Code Cong. & Admin.News 1978, 5787, 5963, 5849–50, 6309–10.

Thus, it is not that we bow to *Oldden* as controlling authority. Rather, it is that the result in *Oldden* is preserved by Bankruptcy Code provisions regarding property of the estate, turnover, and offset.

## II

Three principles underlying the Bankruptcy Code's scheme warrant reiteration.

First, as we said in *Condor*, the § 502(b) caps stand for the proposition that *the estate* will not in any guise be liable for more than the statutory cap. *Condor*, 296 B.R. at 16. This is implemented in part by Bankruptcy Code provisions (§§ 502(e), 502(e)(1)(C), 509(a), 509(c)) subordinating a co-obligor's rights against the estate to

those of the underlying creditor and imposing the same limits on allowance as on the underlying creditor. *Id.*

Congress explained what it was doing in creating the caps when it described § 502(b)(6):

> The history of this provision is set out at length in *Oldden v. Tonto Realty Corp.*, 143 F.2d 916 (2d Cir.1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.

H.R.Rep. No. 95–595; S.Rep. No. 95–989.

The §§ 502(b)(6) & (7) caps, then, reflect a Congressional balance between allowing the creditor with the big rent or employment termination claim to be paid a reasonable sum without unfairly diluting or squeezing out other creditors.

The second principle is a corollary of the first. The key focus in assessing a security deposit is on the effect on the estate (not the creditor) and whose property is in question. If the refund obligation is owed to the estate and, hence, property of the estate that must be returned to the estate, then the analysis is straightforwardly the *Oldden* result.

We pointed the direction when we explained in *Condor* why our analysis of letter of credit guarantees under § 502(b)(7) did not conflict with the way security deposits are treated under § 502(b)(6). *Condor*, 296 B.R. at 19.[7] Now that we are presented with a security deposit, the same reasoning applies.

One crucial consequence of the analysis is, however, that if the security deposit is not property of the estate because it was provided by somebody else (e.g., an accommodation from a relative or friend) and is refundable to that person, then the result is probably different. If the estate has no claim on the security deposit, then the security deposit is more in the nature of a mere guaranty and ought to have no effect on the § 502(b)(6) cap; insisting that the security deposit be credited against the § 502(b)(6) capped claim in such circumstances would operate as a windfall to the other unsecured creditors that would upset the balance fixed by Congress.

The third principle complements the first. While the caps operate to limit the estate's liability by way of disallowing claims that are otherwise valid under nonbankruptcy law, they do not limit the capped creditor's damages, and right to recover from others, under applicable nonbankruptcy law. Under § 524(e), any other person who is liable for the disallowed portion of the capped creditor's damages remains liable for damages that are otherwise available under applicable nonbankruptcy law. As noted above, the Bankruptcy Code does not confer independent rights against the estate on co-obligors. In other words, the estate's cap shelters the estate but not co-obligors.

7. We said:
> Nothing, however, about the § 502(b)(6) security deposit doctrine is inconsistent with our general analysis regarding the § 502(b)(7) cap.
>
> The key here is recognizing that a security deposit on a lease is presumptively refundable to the lessee and is not entirely the landlord's property. Hence, it is an interest in property that is property of the estate.

> The underlying premise of both the § 502(b)(6) and (b)(7) caps is that the property of the estate will be liable for up to one-year's rent or one-year's compensation of a terminated employee. To the extent the security deposit represents property of the estate, it may be appropriately credited directly against the claim at the time of the filing of bankruptcy.
>
> *Condor*, 296 B.R. at 19.

In light of these principles, we should be articulating a rational analysis for deciding this and future appeals because the upshot of this state of the law is an inexorable desire by well-advised landlords entering into long-term leases (and employees with substantial employment contracts) to devise credit enhancements that will not be defeated by bankruptcy. Congress, in effect, has blessed such strategies through § 524(e), which leads parties to address bankruptcy risk by requiring creditworthy co-obligors or insisting that security deposits come from sources, and with refund obligations, that are not property of the estate.

Under the terms of the Bankruptcy Code, such strategies are viable.

## III

The treatment of guarantors as a form of co-obligor under the Bankruptcy Code is pertinent.

### 1

Consider first the case of a simple guarantor. It is possible that a third person could guarantee all payments under a long-term lease. If such a lease is terminated in bankruptcy, it is subject to the § 502(b)(6) cap, yet the guarantor is nevertheless liable under § 524(e) for the full amount of the landlord's damages and is subordinated to the rights of the landlord. If the landlord receives less than the full amount of the § 502(b)(6) cap from property of the estate, then the guarantor can be paid the balance per §§ 502(e) and 509.

It is also possible that the third person guaranteeing payment may insist upon collateral from the tenant to secure his right to be reimbursed by the landlord. If the tenant did provide valuable collateral to the guarantor, and if the landlord has received from the estate full payment on the § 502(b)(6) capped claim and the balance from the guarantor, then the guarantor's reimbursement claim is disallowed under § 502(e) and any alternative subrogation claim is disallowed under § 509. Since the guarantor does not hold an allowed claim, its collateral is not supported by an allowed secured claim and must be returned to the trustee under § 542.

### 2

Next, there is the guaranty provided by the letter of credit. We resolved in *Condor* that letters of credit are essentially a form of co-obligation. This point is poorly understood, as too little notice has been taken of a significant 1995 change to UCC Article 5 clarifying the rights of issuers of letters of credit. There are two key facets.

#### a

First, a letter of credit functions as a guaranty in which the guarantor has fewer rights than most guarantors in the sense that the letter-of-credit "independence principle" codified at UCC § 5–103(d) precludes the issuer from asserting defenses that an ordinary guarantor could assert.[8]

##### (1)

Although the "independence principle" means that the issuer of the letter of credit must pay first and ask questions about the underlying transaction later, the issuer of a letter of credit nevertheless has indemnification rights characteristic of guarantors. These rights are established by statute

---

**8.** The UCC's codification of the letter-of-credit "independence principle" is:

(d) Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary. Cal. Comm.Code § 5103(d) (UCC § 5–103(d)).

and contract and were clarified by the adoption of new UCC § 5–117 in 1995.

By statute, an issuer that honors (pays) a presentation of a letter of credit "is entitled to be reimbursed by the applicant in immediately available funds not later than the date of its payment of funds." Cal. Comm.Code § 5108(i)(1) (UCC § 5–108(i)(1)(1995)).

By contract, an issuer and applicant are permitted to negotiate other rights—such as provision of collateral, third-party guarantees, and assignments of rights—in order to assure the issuer that it will not be left with only a worthless right of reimbursement after it issues the letter of credit. *Cf.* Cal. Comm.Code § 5103(c) (UCC § 5–103(c)(1995)).

Such a reimbursement right, statutory or contractual, is honored in bankruptcy by § 502(e) as a "claim for reimbursement ... of an entity that ... has *secured* the claim of a creditor," which is allowed subject to § 502(e)'s stated limits.

As will be seen, the current UCC Article 5 clarifies that such a reimbursement right is also honored by § 502(e) as a "claim for reimbursement ... of an entity that is *liable with* the debtor on ... the claim of a creditor" and is allowed subject to § 502(e)'s stated limits.

Thus, § 502(e) treats a letter of credit issuer in the same fashion as other guarantors.

### (2)

Subrogation rights are also potentially applicable, especially after the 1995 revision of UCC Article 5 made significant changes in subrogation rules regarding letters of credit by eliminating a number of technical distinctions that had led courts to conclude that subrogation was not available in letter of credit transactions.

New UCC § 5–117(a) abolished former distinctions that led courts before 1995 to discriminate against letters of credit on the premise that the "independence principle" entailed separate obligations such that the issuer was not "liable with" the underlying obligor. Thus, UCC 5–117(a) provided:

(a) An issuer that honors a beneficiary's presentation is subrogated to the rights of the beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.

Cal. Comm.Code § 5117(a) (UCC § 5–117(a)(1995 version)).

This does not create an independent right of subrogation, but rather ties subrogation to settled secondary obligation law that limits subrogation to unjust enrichment situations and constitutes an adoption of the position taken by Circuit Judge Becker in his dissent to *Tudor Dev. Group, Inc. v. United States Fid. & Guar. Co.*, 968 F.2d 357, 364–71 (3d Cir.1992).

Thus, the Official Comment to the new provision explains that:

1. By itself this section does not grant any right of subrogation. It grants only the right that would exist if the person seeking subrogation "were a secondary obligor." (The term "secondary obligor" refers to a surety, guarantor, or other person against whom or whose property an obligee has recourse with respect to the obligation of a third party. See Restatement of the Law Third, Suretyship § 1 (1995).) If the secondary obligor would not have a right to subrogation in the circumstances in which one is claimed under this section, none is granted by this section. In effect, *the section does no more than to remove an impediment that some courts have found to subrogation because they*

conclude that the issuer's or other claimant's rights are "independent" of the underlying obligation. If, for example, a secondary obligor would not have a subrogation right because its payment did not fully satisfy the underlying obligation, none would be available under this section. The section indorses the position of Judge Becker in *Tudor Development Group, Inc. v. United States Fidelity and Guaranty,* 968 F.2d 357 (3d Cir.199[2] ).

Official Comment, UCC § 5–117 (1995) (emphasis supplied).

The Official Comment has been amplified by a leading letter-of-credit commentator:

Section 5–117 dismantles a variety of technical arguments that courts and commentary, including earlier editions of this treatise, raised against subrogation in that context.

That is quite definitely not to say, however, that Section 5–117 creates a right of subrogation for parties to letter of credit transactions. It does not; it merely dismantles technical distinctions between letters of credit (primary obligations) and suretyship arrangements or guaranties (secondary obligations) for subrogation purposes. Subrogation under Section 5–117 is derivative of suretyship law and leaves intact the engine of subrogation in that law: unjust enrichment. Subrogation, a creature of equity, is a remedy. It redresses the unfairness of unjust enrichment. Without unjust enrichment, subrogation is a loose remedy that can upset after the fact risk that mature commercial parties have allocated before the fact. To give parties a subrogation remedy without first finding unjust enrichment is to invest courts with the power to undo at their whim commercial relationships that private contracting parties have arranged.

John F. Dolan, *Letters of Credit: Commercial and Standby Credits* ¶ 7.05[2] (Rev. ed.2000) (footnotes omitted).

New UCC § 5–117 eviscerates the rationale of bankruptcy decisions under the pre–1995 regime that reject § 509 subrogation for letter-of-credit issuers on the premise that the independence principle means that the issuer is not "liable with" the debtor. *Hamada v. Far East Nat'l Bank (In re Hamada),* 291 F.3d 645, 651–52 (9th Cir.2002) (pre–1995 UCC);[9] *CCF, Inc. v. First Nat'l Bank & Trust Co. (In re Slamans),* 69 F.3d 468, 475–76 (10th Cir. 1995) (pre–1995 UCC). The premise on which such decisions rest is, of course, one of the distinctions dismantled by new UCC § 5–117. Thus, neither *Hamada* nor *Slamans* retains vitality.

Moreover, the terms of § 509 extend beyond those persons who are "liable with" to include those who have "secured a claim against the debtor." 11 U.S.C. § 509(a).

In sum, there are substantial arguments in favor of permitting letter-of-credit is-

---

9. Although decided in 2002, the *Hamada* decision involved a letter of credit issued before 1995. The transition provision in California's enactment of the new Article 5 in 1996 (effective January 1, 1997, per CAL. CONST. ART. 4, § 8) provided that it did not apply to any letter of credit issued before the effective date: "A transaction arising out of or associated with a letter of credit that was issued before the effective date of this act and the rights, obligations, and interests flowing from that transaction are governed by the applicable law repealed by this act as if repeal had not occurred and may be terminated, completed, consummated, or enforced under that other law." 1996 Cal. Stats. c. 176, § 15. Thus, *Hamada* (which did not mention that it was applying law that had subsequently changed) should not be understood to be perpetuating the now-rejected distinction upon which it relied.

suers to be subrogated under § 509 whenever unjust enrichment can be demonstrated.

(3)

In view of new UCC § 5–117, there is no principled reason to treat letters of credit in bankruptcy as different than other guarantees for purposes of §§ 502(e) and 509. The former objection that letters of credit are primary, not secondary, obligations was obliterated by the adoption of UCC § 5–117(a) in the 1995 version of Article 5. Thus, as we said in *Condor*, "[w]hile letters of credit are specialized financial instruments governed by Article 5 of the Uniform Commercial Code, there is nothing about the basic structure of the letter of credit transaction that calls for treatment different than other co-obligors in bankruptcy." *Condor*, 296 B.R. at 16.

b

Second, the common assumption that letters of credit and other forms of guaranty or credit enhancements are devices by which the §§ 502(b)(6)-(7) caps can be circumvented is incorrect. Although landlords unquestionably get more out of their credit enhancements, the estate is never liable for more than the amount of the statutory cap.

While it is true that one of the three contracts entailed in a letter of credit transaction is the reimbursement contract between the applicant (person obtaining letter of credit) and the issuer providing for reimbursement of the issuer for draws by the beneficiary on the letter of credit, that reimbursement contract right is treated in bankruptcy like any other co-obligation and leaves the issuer of the letter of credit subrogated to the rights of the beneficiary against the estate. Once the allowable claim (up to the § 502(b)(6) cap) is paid in full, then all other claims, including

the issuer's claim against the estate on the reimbursement contract, are disallowed.

To the extent the issuer holds collateral that is property of the estate and that is not eligible for offset under § 553(a) because the claim is "disallowed" under § 502 (which does not distinguish between secured and unsecured claims), the collateral has to be turned over to the estate under § 542.

Reliance on *Oldden* is misleading in this modern context even though the Bankruptcy Code achieves the same result as *Oldden* when the same facts exist. Yet, the important analysis is the details of how the Code achieves that result, because that process also indicates the limits of *Oldden* under the Code. It is in the latter area that the hard decisions crop up. It is simply not helpful in such instances to use *Oldden* as a talisman and to try to decide cases on whether or not they are a "circumvention" of *Oldden*.

IV

In Part IV–B of the majority opinion, we explain why we reject the argument that, on the premise that neither the letter of credit nor the proceeds are property of the estate, the draw on the letter of credit should not be credited against the landlord's § 502(b)(6) allowed claim.

The simple answer is that, regardless of whether the premise regarding ownership of the letter of credit and its proceeds is true, the draw on the letter of credit triggered reimbursement of the issuer from, under the facts of this case, the Debtor's pledged funds that were property of the estate and that were the source of the "immediately available funds" to which the statutory reimbursement obligation applies.[10] Moreover, the Landlord contractu-

---

**10.** As noted, the reimbursement obligation is statutory: "(i) An issuer that has honored a

ally agreed in the lease that letter of credit proceeds are part of the security deposit that must be refunded to the Debtor following faithful performance of the lease. Hence, the funds are unambiguously property of the estate and count against the § 502(b)(6) cap.

The Third Circuit decision in *Solow v. PPI Enter., Inc. (In re PPI Enter., Inc.)*, 324 F.3d 197 (3rd Cir.2003), in which a letter-of-credit security deposit was a side issue, is a puzzle that is difficult to decipher due to gaps in the facts. In particular, its facts do not indicate who provided the consideration for the letter of credit that was used as a security deposit and to whom any refund would have been owed.

Nevertheless, it is appropriate to posit that *PPI* was not soundly reasoned because its treatment of the letter of credit that was posted as a "security deposit" under the lease appears to proceed from the incorrect premise that § 502(b)(6) operates as a limit on the landlord's remedy, as opposed to (per *Condor*) being a limit on the estate's liability. This point is critical to assessing related liability issues.

Whether the actual result in *PPI*, which deducted the letter of credit proceeds from the § 502(b)(6) capped claim, was correct, turns on whether PPI or someone else funded the letter of credit that was posted as a security deposit and whether the lease provided that the security deposit would be refunded to PPI following faithful performance of the lease. Both of these material facts are omitted from the *PPI* decision. What we do know is that the debtor's UK corporate parent guaranteed the lease. Although the *PPI* bankruptcy did not (under § 524(e)) affect the liability of the guarantying parent entity, the guaranty wound up being worthless when the guarantying parent corporation came "under administration" in the UK (the UK equivalent of chapter 11). A further complication is that the lease termination and the landlord's liquidation and application of the "security deposit" letter of credit occurred a number of years before bankruptcy.

The Third Circuit treated the contractual term "security deposit" as a talisman and held that the letter of credit counted against the § 502(b)(6) cap because the lease required a security deposit in the form of a letter of credit and because it should not permit an "end run" around the § 502(b)(6) cap, which it (incorrectly) viewed as capping the landlord's remedies. As noted, whether the reimbursement obligation constituted property of the PPI estate remains shrouded in mystery so long as we do not know who funded the letter of credit that was used as the security deposit.

The key points about *PPI*, however, are that it reasoned from the premise that § 502(b)(6) caps the landlord's remedies, rather than caps the estate's liability and that it applied *Oldden* as precedent instead of examining the provisions of the Bankruptcy Code that are designed to lead to the result in *Oldden* in some situations. In those respects, it is distinctly incorrect.

The observations at the end of Part IV–B of the majority's opinion that the letter

presentation as permitted or required by this division: (1) is entitled to be reimbursed by the applicant in immediately available funds not later that the date of its payment of funds." Cal. Comm.Code § 5108(i)(1). The key question is always "who provided the immediately available funds?" Of course, one aspect of the letter-of-credit independence principle is that the issuer must pay regardless of whether funds for reimbursement are, in fact, immediately available; in other words, the issuer bears the credit risk and is expected to have made satisfactory arrangements when the letter of credit was issued.

of credit reflects "an attempt to circumvent *Oldden*" and that "the logic of *Oldden* should apply" have us making the same mistake as the Third Circuit when it reasoned that allowing the landlord to keep the security deposit without adjusting the capped claim would lead to "an end run around § 502(b)(6), since [lessor] would receive a windfall at PPIE's, and other creditors', expense, and PPIE would be liable twice for the same amount of money." *PPI*, 324 F.3d at 209.

The assumption in the majority opinion (and the Third Circuit's assumption in *PPI*) that the estate would be liable for more than the § 502(b)(6) cap does not withstand scrutiny. When one passes the facts through the prism of the Bankruptcy Code's scheme regarding disallowance, subrogation, turnover, and setoff it is apparent that the estate cannot be liable for more than the § 502(b)(6) cap. If the security deposit is property of the estate, then the estate is not liable for more than the cap and the same result as *Oldden* is achieved.

Although there is a potential for a "windfall," it is the opposite of the windfall that the Third Circuit perceived in *PPI* and would arise in the circumstance in which the security deposit is not property of the estate (i.e. the deposit was provided by a third party and is not refundable to the debtor). If the *Oldden* rationale is applied too broadly by crediting the third-party security deposit against the § 502(b)(6) cap, then the estate would be liable for less than the cap, which would be a windfall to the estate and other creditors. This is why we need to be clear that the reasoning of *Oldden* is not a reliable guide to the correct result under the Bankruptcy Code.

## V

Part IV–C of the opinion makes the valid point that the economic interests surrounding a security deposit are more important than the precise form of the security deposit. This is consistent with the modern suretyship and guaranty principle that the substance of a transaction is more important than its form. Restatement (Third) of Suretyship & Guaranty § 1(3)(a) (1995).[11]

The references in the discussion, however, to the rationale of *Oldden* and to obtaining an advantage run counter to the proper statutory analysis of the Bankruptcy Code and lead into the intellectual trap of thinking that § 502(b)(6) is a cap on landlord remedies rather than a cap on the estate's liability. The correct point is that (as *Condor* explains) the total cost to the estate in any manner cannot exceed the statutory cap.

\*     \*     \*     \*     \*     \*

The bottom line is that landlords are permitted to obtain credit enhancements that will net them more than the

---

11. That portion of the Restatement provides: "If the criteria of subsection (2) are fulfilled, the secondary obligor has suretyship status: regardless of the form of the transaction fulfilling the criteria[.]"

The Comments regarding the dominance of substance over form explain: "the determinative question will often be whether the essential purpose of the secondary obligation is to protect the obligee against the actual or potential nonperformance of the underlying obligation by giving the obligee recourse against the secondary obligor." Restatement (Third) of Suretyship & Guaranty § 1, comment *h*. They add that: "A person may be a principal obligor as to part of an obligation and a secondary obligor as to another part of the obligation." *Id.*, comment *o*.

California law follows the Restatement (Third) of Suretyship & Guaranty. *Vallely Inv., L.P. v. BancAmerica Commercial Corp.*, 88 Cal.App.4th 816, 106 Cal.Rptr.2d 689, 699 (2001).

§ 502(b)(6) cap, but only so long as the excess does not come from property of the estate.

I CONCUR in the result.